IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION



HEALTHKEEPERS, INC.,

Plaintiff,

v.

Action No. 3:09-CV-160

RICHMOND AMBULANCE AUTHORITY,

Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court on cross-motions for summary judgment (Docket Nos. 14, 16). HealthKeepers, Inc. ("HealthKeepers") seeks summary judgment on a declaratory judgment action that requests this Court to recognize that the 2007 Medicaid Amendment applies to emergency ambulance services provided by the Richmond Ambulance Authority ("Authority") to HealthKeepers' Medicaid managed care enrollees and, therefore, that the Authority may not charge more than the amounts set by Virginia's Department of Medical Assistance. For its part, the Authority seeks summary judgment on HealthKeepers' claim, arguing that it is not covered by the Medicaid Amendment, and therefore can charge its own rates for its emergency transport of HealthKeepers' Medicaid-eligible enrollees. For the reasons stated herein, and because there are no disputes as to any material facts, the Court GRANTS the Authority's Motion and DENIES HealthKeepers' Motion.

# I. BACKGROUND

This dispute concerns what rate Plaintiff HealthKeepers, as a Medicaid managed care provider, must pay Defendant Richmond Ambulance Authority when the Authority provides emergency transportation services to HealthKeepers' Medicaid enrollees. A full understanding of this disagreement requires discussion of not only the exact nature of the parties' businesses but also the Medicaid system.

## A. Medicaid

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, creates a medical assistance program—popularly known as "Medicaid"—that provides resources to low-income individuals and families for healthcare services. Harris v. McRae, 448 U.S. 297, 308 (1980). Medicaid is a cooperative federal-state program. On the federal side, Medicaid is managed by the Secretary of Health and Human Services ("HHS"), who has delegated this authority to HHS's Centers for Medicare and Medicaid Services ("CMS"). In Virginia, the state counterpart to CMS is the Department of Medical Assistance ("DMAS").

DMAS arranges to cover the cost of healthcare for eligible persons in several ways. For some Medicaid-eligible persons, DMAS makes payments directly to providers. For other Medicaid-eligible persons, DMAS arranges with a type of Health Maintenance Organization ("HMO") called a "managed care organization" ("MCO") to provide those individuals with coverage. When an MCO enrollee needs medical care, the MCO pays the enrollee's providers.

## B. The Parties

Plaintiff HealthKeepers is a private, for-profit corporation that operates as a commercial HMO as well as an MCO. In Virginia, HealthKeepers offers a managed care plan to Medicaid-eligible persons called "Anthem HealthKeepers Plus" under a contract between HealthKeepers and DMAS.

Defendant Richmond Ambulance Authority was created by the Virginia General Assembly in 1991 and empowered by the City of Richmond to be the sole provider of emergency ambulance services in Richmond. (Joint Stipulations ("JS"), Exs. 1-4.) The Richmond Ambulance Authority Act permits the Authority to set its own rates and mandates that "[s]uch rates ... shall not be subject to supervision or regulation by any bureau, board, commission or other agency of the Commonwealth or of any political subdivision." (JS, Ex. 1, at 10.[1])

The Authority has provided and continues to provide emergency ambulance services to HealthKeepers' Medicaid-eligible enrollees. This relationship, including payment obligations, was previously governed by a 1992 Agreement, however, since February 28, 2001, there has not been a written contract between the Authority and HealthKeepers for the Anthem HealthKeepers products. Absent a contract, a dispute arose between the parties as to what rate HealthKeepers would have to pay for the services the Authority provided to HealthKeepers' Medicaid members. HealthKeepers asserted that it should have to pay the rates established by DMAS; the Authority claimed it could charge its own rates. In a 2001 ruling, the Circuit Court of the City of Richmond sided with the

---

[1] The cited page numbers refer to the consecutive numbers added by the parties to the lower right hand corner of each page of the Joint Stipulations.

Authority. Since that decision, HealthKeepers has been paying the Authority's rates for services rendered by the Authority to HealthKeepers' Medicaid-eligible enrollees.

## C. The 2007 Medicaid Amendments

The central question in the instant dispute is how, if at all, did the 2007 Medicaid Amendments effect the requirement that HealthKeepers continue to pay the Authority's rates. Prior to 2007, the subsection of the statute at issue, which was added to section 1936u-2 by the Balanced Budget Act of 1997, read, in relevant part, as follows:

> **(b) Beneficiary protections**
> ...
> (2) Assuring coverage to emergency services
> (A) In general
> Each contract with a medicaid managed care organization ... shall require the organization or manager—
> (i) to provide coverage for emergency services (as defined in subparagraph (B)) without regard to prior authorization or the emergency care provider's contractual relationship with the organization or manager,
> ...
> (B) "Emergency services" defined
> In subparagraph (A)(i), the term "emergency services" means, with respect to an individual enrolled with an organization, covered inpatient and outpatient services that—
> (i) are furnished by a provider that is qualified to furnish such services under this subchapter, and
> (ii) are needed to evaluate or stabilize an emergency medical condition (as defined in subparagraph (c)).
>
> (C) "Emergency medical condition" defined
> In subparagraph (B)(ii), the term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in—
> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

4

> (ii) serious impairment to bodily functions, or
> (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1936u-2(b)(2).

Subsequently, in 2006, Congress passed the Deficit Reduction Act of 2005, which amended the Social Security Act by appending Section 1936u-2(b)(2)(D) to follow the statutory language quoted above ("Medicaid Amendment"). Effective on January 1, 2007, subsection (b)(2)(D) addressed how much an MCO had to pay providers of "emergency services" in certain situations:

> Any provider of emergency services that does not have in effect a contract with a Medicaid managed care entity that establishes payment amounts for services furnished to a beneficiary enrolled in the entity's Medicaid managed care plan must accept as payment in full no more than the amounts (less any payments for indirect costs of medical education and direct costs of graduate medical education) that it could collect if the beneficiary received medical assistance under this subchapter other than through enrollment in such an entity. In a State where rates paid to hospitals under the State plan are negotiated by contract and not publicly released, the payment amount applicable under this subparagraph shall be the average contract rate that would apply under the State plan for general acute care hospitals or the average contract rate that would apply under such plan for tertiary hospitals.

42 U.S.C. § 1396u-2(b)(2)(D).

Following the enactment of the Amendment, another dispute arose between the parties. HealthKeepers informed the Authority that since (1) the Authority is a "provider of emergency services" that (2) does not have in effect a contract addressing services rendered to Medicaid enrollees with (3) HealthKeepers, a Medicaid managed care entity, the Medicaid Amendment now controls the maximum level of payment the Authority must accept for emergency ambulance services. Under the Medicaid Amendment, that amount would be the amount set by DMAS. The Authority disagreed, arguing that it is not a

5

"provider of emergency services" and that it had a "quantum meruit" contract with HealthKeepers, both of which removed the Authority from the ambit of the Medicaid Amendment.

In an effort to settle the dispute, HealthKeepers directly asked CMS whether a provider of emergency ambulance services would be considered a "provider of emergency services" under the Medicaid Amendment. (JS, Ex. 25.) In a September 2008 letter, CMS responded that "it is our position that the phrase 'provider of emergency services' in section 1932(b)(2)(D) of the Act include providers of emergency ambulance service when the transportation is needed to evaluate or stabilize an emergency condition and the provider is qualified to furnish these services under title XIX of the Act." (JS, Ex. 25, at 653.)

Despite attempts to negotiate a resolution to this dispute, the parties have been unable to reach an agreement. Consequently, HealthKeepers filed this suit, seeking a declaratory judgment that the Medicaid Amendment covers the services the Authority provides to HealthKeepers' Medicaid enrollees. After filing a number of Joint Stipulations, both parties have now filed cross-motions for summary judgment.

## II. DISCUSSION

### A. Legal Standard

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). All "factual disputes and any competing, rational inferences [are resolved] in the light most favorable to the party opposing that motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir.

2003) (internal quotation marks and citations omitted). In making its decision, a court must look to the affidavits or other specific facts pled to determine whether a triable issue exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Where no genuine issue of material fact exists, it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted). Mere unsupported speculation is not sufficient if the undisputed evidence indicates the other party should win as a matter of law. Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008). However, summary judgment should not be granted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

When faced with cross-motions for summary judgment, the standard is the same as that applied to individual motions for summary judgment. The court must consider each party's motion "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). If the court finds that there is a genuine issue of material fact, both motions must be denied. 10A Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d § 2720. However, "if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." Id.

**B. Analysis**

To benefit from the Medicaid Amendment's price controls, a Medicaid enrollee must receive "emergency services" from a provider that does not have a contract with an MCO. See 42 U.S.C. § 1936u-2(b)(2)(D). Although the parties agree that Healthkeepers is an MCO

7

and that the Authority is a provider under the Medicaid Amendment, they dispute how the Court should define the phrase "emergency services" and whether a contract exists between them. Thus, the first question the Court must address here is whether the phrase "emergency services" in 42 U.S.C. § 1396u-2(b)(2)(D) should be defined using the definition for that phrase given in § 1396u-2(b)(2)(B), as the Authority asserts, or whether it should be given its plain and ordinary meaning, as Healthkeepers would have it. Because the Court agrees with the Authority's position, the follow up question necessarily becomes whether the definition of "emergency services" provided in § 1396u-2(b)(2)(B), which states that such services include "outpatient services," encompasses any services provided by the Authority. Each issue is discussed below.

### 1. Whether the Definition of "Emergency Services" in § 1396u-2(b)(2)(B) should apply to § 1396u-2(b)(2)(D)

There is a hierarchal approach that courts must follow in construing a statute. First, the Court "determine[s] whether the language at issue has a plain and unambiguous meaning." Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002). In order to be ambiguous, the disputed language must be "reasonably susceptible of different interpretations." Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. 451, 473 n.27 (1985). Generally, when examining statutory language, words are given their common usage. Smith v. United States, 508 U.S. 223, 238 (1993). "Courts are not free to read into the language what is not there, but rather should apply the statute as written." Id. If no ambiguity exists, then the plain meaning of the text is conclusive and the inquiry generally comes to an end. Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). In determining whether the meaning of statutory language is plain or ambiguous, courts look

to "the language [of the statute] itself, the specific context in which that language is used, and the broader context of the statute as a whole." Id. at 342 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477 (1992); McCarthy v. Bronson, 500 U.S. 136, 139 (1991)). A court may also employ traditional tools of statutory construction to ascertain whether Congress has spoken on the precise question at issue. Chevron USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 n.9 (1984).

Among these tools includes the principle that "where possible, courts should give effect to every word in a statute." United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist., 528 F.3d 292, 304 (4th Cir. 2008). The in pari materia canon dictates that neighboring statutory subsections that refer to the same subject matter "must be read ... as if they were a single statute." Va. Int'l Terminals, Inc. v. Edwards, 398 F.3d 313, 317 (4th Cir. 2005). Similarly, it has also been said that "there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." Atl. Cleaners & Dyers v. United States, 286 U.S. 427, 433-34 (1932). Though, the Supreme Court further stated that "the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." Id.

Next in the hierarchy, if the statutory language appears to be unambiguous, a court must look beyond that plain language where a literal interpretation would lead to an absurd result, or would otherwise produce a result "demonstrably at odds with the intentions of the drafters." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989)

9

(internal quotation marks omitted); Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982).

Third, if application of the plain meaning approach dictates that the language is ambiguous or that application of the statute would lead to results demonstrably at odds with congressional intent, then the court may employ other interpretive tools, such as evaluating the statutory structure, relevant legislative history, and congressional purposes expressed in the pertinent act, as well as applying general principles of law applicable to the circumstances of the statute. Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 737 (1985).

Here, the Court's first task is to decide whether the definition of "emergency services" in § 1396u-2(b)(2)(B) applies to the phrase "emergency services" in § 1396u-2(b)(2)(D) even though § 1396u-2(b)(2)(B) states that the definition is meant to apply "in subparagraph (A)(i)" and § 1396u-2(b)(2)(B) was enacted nearly ten years before 1396u-2(b)(2)(D) was added to the statute. The Court must determine the meaning of this phrase by considering the language of the statute itself, the specific context in which that language is used, and the broader context of the statute as a whole in light of traditional tools of statutory construction. Robinson, 519 U.S. at 342; Chevron, 467 U.S. at 843.

Due to the language in § 1396u-2(b)(2)(B), which does not include a directive to use the definition for subsection (b)(2)(D) as well, a reading of the plain meaning of the phrase does not resolve the issue. On the one hand, the Court could import the definition in § 1396u-2(b)(2)(B) despite its apparent limitation. On the other, the Court could limit §

1396u-2(b)(2)(B)'s definition to subparagraph (A)(i) and define the phrase "emergency services" by its plain and ordinary meaning.

The difficulty here is that for every canon of statutory construction that appears to favor a particular interpretation of the statutory language, there seems to be an equal and opposite canon pushing for the contrary interpretation. See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115 (2001). HealthKeepers asserts that § 1396u-2(b)(2)(B) should not apply to § 1396u-2(b)(2)(D) because that would render the language "in subparagraph (A)(i)" in § 1396u-2(b)(2)(B) superfluous. The Authority contends that the definition in § 1396u-2(b)(2)(B) should apply to § 1396u-2(b)(2)(D) because the same phrase in the same statute should be given the same meaning.

Similar disputes have not produced a clear answer here. For example, in U.S. Postal Serv. v. Amada, the Ninth Circuit held that the definition of "lottery" in 18 U.S.C. § 1307(b) did not apply to the related civil provision in 39 U.S.C. § 3005 because the definition in the criminal statute stated it was "[f]or purposes of subsection b." 200 F.3d 647, 650-51 (9th Cir. 2000). Yet, in United States v. Perkins, the Fourth Circuit imported the definition of "bodily injury" from 18 U.S.C. §§ 831(f)(5), 1365(h)(4), 1515(a)(5), 1864(d)(2) into 18 U.S.C. § 242 even though the former sections each contained the limiting phrase "[a]s used in this section." See Perkins, 470 F.3d 150, 161 (4th Cir. 2006) (citing United States v. Myers, 972 F.2d 1566, 1572 (11th Cir. 1992) (noting that "[w]hen Congress uses, but does not define a particular word, it is presumed to have adopted that word's established meaning")).

Faced with those disparate treatments of statutory construction principles, the Court must apply the principle that makes the most sense in light of the text, its context and purpose, and any well-reasoned agency interpretation. Here, that approach favors the Authority. Unlike Healthkeepers' approach, applying the rule of statutory construction which assumes that "identical words used in different parts of the same act are intended to have the same meaning" maintains a coherent and logical statutory scheme. See Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 87 (1934). That Congress included an explicit definition of "emergency services" in the same <u>subsection</u> strengthens the presumption. And that both subsections concern beneficiary protections is especially damaging to any claim that "the words, though in the same act, are found in such dissimilar connections as to warrant the conclusion that they were employed in the different parts of the act with different intent." See id. Moreover, contrary to HealthKeepers' contentions, using the definition in § 1396u-2(b)(2)(B) does not render the "in subparagraph (A)(i)" language superfluous. The language in § 1396u-2(b)(2)(B) is not one of exclusivity, rather it simply restricts the meaning of the phrase in subsection (A)(i) to the definition in § 1396u-2(b)(2)(B), but it does not limit the power of Congress to adopt that definition for other uses of that phrase, especially in the same subsection. See Perkins, 470 F.3d at 161 (holding that language stating "[a]s used in this subsection" did not prevent court from applying that definition to another statute); cf. Arthur Iron Mining Co. v. Landy, 103 F.2d 164, 165-66 (8th Cir. 1939) (holding that the words "As used in this section" restricted the meaning of the word in that section to that definition, but did not limit the power of Congress to adopt the definition by reference in another section of the tax code).

12

HealthKeepers argues that the earlier enacted subsections (A) though (C) have an entirely different purpose than subsection (D) and thus should be treated differently. (HealthKeepers Opp. Memo. 5.) According to HealthKeepers, subsections (A) through (C) concern what services are covered while subsection (D) concerns what a non-contracting provider must accept as payment in full. This attempt to narrow the purpose of these subsections fails to recognize that each section deals with Medicaid beneficiary protections, just as the title of the section suggests. Thus, the purpose of this section further supports giving the phrase "emergency services" the same meaning it has elsewhere in the same section.

That conclusion is further bolstered by the treatment CMS, the agency in charge of administering Medicaid, has consistently given the phrase "emergency services." In a March 31, 2006 letter to a State Medicaid Director, the Director of CMS explained that the recently enacted § 1396u-2(b)(2)(D) will soon require managed care organizations that provide emergency services—as that term is defined in § 1396u-2(b)(2)(B)—to a Medicaid eligible beneficiary to accept a State's payment structure if the service provider does not have a contract with the MCO. (JS, Exh. 22, at 622.) Likewise, in a November 17, 2006 letter, CMS again stated that the newly enacted § 1396u-2(b)(2)(D) would apply to all emergency services as defined in § 1932(b)(2). (JS, Exh. 23, at 624.) These agency interpretations, though not necessarily authoritative, do provide some support for the Court's conclusion.

HealthKeepers though, cites a more recent CMS letter that it alleges takes a different position and dictates a different result. The two-page September 25, 2008 letter from CMS

to attorney Robert Roth states that it is CMS's "position that the phrase 'provider of emergency services' in section 1932(b)(2)(D) of the Act does include providers of emergency ambulance service when the transportation is needed to evaluate or stabilize an emergency condition and the provider is qualified to furnish these services under title XIX of the Act." (Exh. 26, at 658.) No where in the letter does CMS confront or discuss whether the definition in § 1396u-2(b)(2)(B) should apply to § 1396u-2(b)(2)(D)—though the parties have spent pages on that very subject in their motions for summary judgment. This letter lacks the thoroughness and consideration that is required in order for this Court to give it any deference. See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). Besides, it is not clear that the letter actually supports Healthkeepers' position. Even though it does not discuss § 1396u-2(b)(2)(B), the section of the letter just quoted actually uses a portion of the language of § 1396u-2(b)(2)(B), which states, in part, that emergency services are those that: "(i) are furnished by a provider that is qualified to furnish such services . . . , and (ii) are needed to evaluate or stabilize an emergency medical condition . . . ." So, while CMS clearly used part of the language in § 1396u-2(b)(2)(B) to define "emergency services" in § 1396u-2(b)(2)(D), it omits and fails to discuss the language in § 1396u-2(b)(2)(B) that limits "emergency services" to "covered inpatient and outpatient services." This omission obliterates any persuasive force the letter may have carried. Therefore, in contrast to the conclusion suggested by CMS's 2008 letter, prior reasoned CMS interpretations reinforce the conclusion required by the statutory language and its context and purpose—that the phrase "emergency services" in § 1396u-2(b)(2)(D) is defined by the definition listed in § 1396u-2(b)(2)(B).

## 2. Whether the Authority Provides "Outpatient Services" Under § 1396u-2(b)(2)(D)

The question now becomes whether, in light of the conclusion stated above, the Authority provides emergency services, which the Act defines as (1) covered inpatient and outpatient services (2) that are furnished by a provider qualified to furnish such services and (3) that are needed to evaluate or stabilize an emergency medical condition. See 42 U.S.C. § 1396u-2(b)(2)(B), (b)(2)(D). The parties do not contest that the Authority is a provider qualified to furnish emergency services and HealthKeepers has stated that it only seeks a declaration concerning the Authority's services used to evaluate or stabilize an emergency medical condition. (HealthKeepers Memo. 14 & n.11.) The parties also agree that the Authority does not provide inpatient services. The parties strongly dispute, however, whether the Authority provides "outpatient services."

Again, the analysis begins with the goal of expressing the will of Congress by giving the statutory language its plain and ordinary meaning. Because no section defines "outpatient" in § 1396u-2(b)(2)(B), the Court commences its analysis by looking at how various dictionaries define the word. Webster's Third International Dictionary defines "outpatient" as "[a] patient who is not an inmate of a hospital but receives diagnosis or treatment in a clinic or dispensary connected with the hospital – distinguished from inpatient." Webster's Third New International Dictionary, Unabridged (2002). In the Oxford English Dictionary, an "outpatient" is "[a] patient who is treated at a hospital without being admitted overnight." Oxford English Dictionary (2009). Those definitions as well as others all indicate that the word "outpatient" describes a visit to a hospital or other facility that does not result in an overnight stay. No definition discusses "outpatient" in

15

terms of the type of care provided, as Healthkeepers says. Thus, the ordinary meaning of "outpatient" suggests that the emergency ambulance services provided by the Authority are not "outpatient services" and, as a result, are not covered by the Medicaid Amendment.

The dictionary definition, however, need not be the end of the matter if the "specific context in which that language is used ... [or] the broader context of the statute as a whole" dictates a different result. See Robinson v. Shell Oil Co., 519 U.S. 337, 342 (1997). Yet, context does not alter the plain meaning of the phrase "outpatient services" in this case. For instance, a Medicaid regulation dealing with other provisions of the program defines "outpatient" as

> a patient of an organized medical facility, or distinct part of that facility who is expected by the facility to receive and who does receive professional services for less than a 24-hour period regardless of the hour of admission, whether or not a bed is used, or whether or not the patient remains in the facility past midnight.

42 C.F.R. § 440.2(a). Moreover, section 1396u-2(b)(2)(D) focuses on hospitals:

> In a State where rates paid to <u>hospitals</u> under the State plan are negotiated by contract and not publicly released, the payment amount applicable under this subparagraph shall be the average contract rate that would apply under the State plan for general acute care <u>hospitals</u> or the average contract rate that would apply under such plan for tertiary <u>hospitals</u>.

42 U.S.C. § 1396u-2(b)(2)(D) (emphases added). The "Managed Care" Medicaid regulations promulgated in connection with MCOs also focus on hospitals. One section states that an MCO cannot "[r]efuse to cover emergency services based on the emergency room provider, hospital, or fiscal agent not notifying the enrollee's primary care provider ... of the enrollee's screening and treatment within 10 calendar days of presentation for emergency services." 42 C.F.R. § 438.114(d)(ii).

Other Medicaid regulations indeed discuss ambulances, but only in the context of transportation services. For example, a regulation requiring MCOs to provide all the services covered under a state plan for Medicaid says that the state plan "must ... [s]pecify that the Medicaid agency will ensure necessary transportation for recipients to and from providers." Id. § 431.53(a). "Transportation" is defined as "expenses for transportation and other related travel expenses determined to be necessary by the agency to secure medical examinations and treatment for a recipient." Id. § 440.170(a)(1). And "travel expenses" are defined to include "[t]he cost of transportation for the recipient by ambulance, taxicab, common carrier, or other appropriate means." Id. § 440.170(a)(3)(i). Thus, the context of § 1396u-2(b)(2)(D) and the Medicaid regulations support the conclusion that outpatient services do not include ambulance services.

Once more, CMS's prior interpretation of the phrase "outpatient services" lends support to that result. For instance, in 2001, CMS commented on a proposed rule by stating that "Ambulance services are not included in the definition of 'emergency services,' as that definition refers to 'inpatient and outpatient services.'" See 66 Fed. Reg. 6228, 6289 (Jan. 19, 2001) (Authority Memo. 22 & Exh. 3). Although HealthKeepers correctly points out that the Rule on which CMS commented was never enacted and was made six years before the Medicaid Amendment took effect, the language discussed in the comment has not changed. In other words, even though the Medicaid Amendment did not exist at the time, the point is that CMS took the position that ambulance services are not outpatient services.

In rebuttal, HealthKeepers again heavily relies on the September 25, 2008 letter from CMS to attorney Robert Roth in which CMS observed that "there is no specific statutory language which specificially includes or excludes emergency ambulance providers as a provider of emergency services under section 1932 (b)(2)(D) of the Act..." and then concluded that "the phrase 'provider of emergency services' in section 1932(b)(2)(D) of the Act does include providers of emergency service when the transportation is needed to evaluate or stabilize an emergency condition...." (Exh. 26, at 657-58.) By failing to mention that "emergency services" is defined in the statute, the letter loses any persuasive force it may have had. If CMS thought the definition in § 1396u-2(b)(2)(B) did not apply to § 1396u-2(b)(2)(D), it did not explain why. If CMS thought the definition did apply to § 1396u-2(b)(2)(D), it did not discuss whether ambulance services are considered outpatient services. By not once even mentioning the word "outpatient," the letter reveals its lack of thoroughness and confirms its inability to persuade. See Christensen v. Harris County, 529 U.S. 576, 587 (2000).

While the Court agrees with CMS's observation in its 2008 letter that excluding ambulance service as an emergency service may be inconsistent with the need to ensure that Medicaid recipients have appropriate and affordable access to medical care, the Court must follow the path plowed by logic and the statutory language. Here, that mandate leads to the conclusion that the Authority does not provide outpatient services and therefore is not covered by the Medicaid Amendment.[2]

---

[2] Although it does not change the outcome here, the Court notes that it rejects the Authority's argument that it has a contract with Healthkeepers. The "quantum meruit relationship" the Authority says was created by a 2001 Circuit Court decision is not the

## III. CONCLUSION

For the reasons stated above, the Court GRANTS the Authority's Motion and DENIES HealthKeepers' Motion. Let the Clerk send a copy of this opinion to all counsel of record. An appropriate order will issue.

```
                    /s/
James R. Spencer
Chief United States District Judge
```

ENTERED this __6th__ day of April 2010

---

same as a contractual relationship. Quantum meruit is a judicially created mechanism used to award a reasonable amount of compensation in the absence of a contract. Grubb & Ellis Co. v. Potomac Med. Bldg., LLC, No. 08cv971, 2009 WL 3175999, at *8 & *13 (E.D. Va. Sept. 30, 2009) (citing Mongold v. Woods, 677 S.E.2d 288 (Va. 2009); see also Enomoto v. Space Adventures, Ltd., 624 F. Supp. 2d 443, 459 (E.D. Va. 2009) (citing Mar Tech Mech., Ltd. v. Chianelli Bldg. Corp., 54 Va. Cir. 569, 2001 WL 1262387, at *5 (Va. Cir. Ct. 2001) ( "[E]ven if it were not possible to actually recover under both at the same time .... Plaintiff merely wishes to plead alternative theories of his case [i.e., breach of contract v. quantum meruit], which he is clearly entitled to do, and allow the finder of fact to determine whether the parties did or did not have a contract.")). Moreover, the payment arrangement imposed by the Richmond City Circuit Court in 2001 did not somehow result in the meeting of the minds between the Authority and Healthkeepers necessary to form a contract.